Resp. copy

E-FILED
Friday, 19 July, 2013 03:16:00 PM
Clerk, U.S. District Court, ILCD

## IN THE CIRCUIT COURT OF THE EIGHTH JUDICIAL CIRCUIT
## PIKE COUNTY, ILLINOIS

City of Pittsfield, a non-home rule
municipality

             Plaintiff


vs

American Water Enterprises, Inc., a
Delaware  Corporation and Environmental
Management Corporation, a Missouri
Corporation

No. 2013-L - 7

## SUMMONS

To each defendant: American Water Enterprises, Inc. c/o Illinois Corporation Service C,
    YOU ARE SUMMONED and required to file an answer to the complaint in this case, a copy of which
801 Adlai Stevenson Drive, Springfield, IL 62703
is hereto attached, or otherwise file your appearance, in the office of the clerk of this court at the Pike
County Courthouse in Pittsfield, Illinois, within 30 days after service of this summons, not counting
the day of service.  IF YOU FAIL TO DO SO, A JUDGMENT OR DECREE BY DEFAULT MAY BE
TAKEN AGAINST YOU FOR THE RELIEF ASKED IN THE COMPLAINT.

To the officer:
    This summons must be returned by the officer or other person to whom it was given for service, with
indorsement of service and fees, if any, immediately after service.  If service cannot be made, this sum-
mons shall be returned so indorsed.  This summons may not be served later than 30 days after its date.

Witness, _June 20_____, _2013_

_Debbie Dugan_
                                              Clerk of Court.

By _Molly Caughlen___, Deputy
                                              (Seal of Court)

| | |
|---|---|
| **Name** | Michael J. Hollahan |
| **Attorney for** | Plaintiff |
| **Address** | 109 E. Washington St. |
| **City** | Pittsfield, IL  62363 |
| **Telephone** | 217-285-5593 |

Date of service _____, _____
(To be inserted by officer on copy left with defend-
ant or other person.)

EXHIBIT A

IN THE CIRCUIT COURT OF THE EIGHTH JUDICIAL CIRCUIT
FOR ILLINOIS, PIKE COUNTY

| | | |
|---|---|---|
| CITY OF PITTSFIELD, an Illinois | ) | |
| non-home rule municipality | ) | |
| Plaintiff | ) | |
| | ) | |
| vs | ) | NO. 2013-L- 7 |
| | ) | |
| AMERICAN WATER ENTERPRISES, | ) | |
| INC., a Delaware corporation and | ) | |
| ENVIRONMENTAL MANAGEMENT | ) | |
| CORPORATION, a Missouri corporation | ) | |
| Defendant | ) | |

**FILED**

JUN 20 2013

Debbie Dupuy
Clerk of the Circuit Court
Eighth Judicial Circuit, Pike County, IL

### COMPLAINT FOR BREACH OF CONTRACT

NOW COMES CITY OF PITTSFIELD, an Illinois non-home rule municipality, by its attorney, MICHAEL J. HOLLAHAN, of Hollahan Law Office, and in complaining of the Defendant, ENVIRONMENTAL MANAGEMENT CORPORATION, hereinafter "EMC", states as follows:

1.      City of Pittsfield in an Illinois non-home ruled municipality located in Pittsfield, Pike County, Illinois.

2.      Environmental Management Corporation is a Missouri corporation with its principal place of business at 1001 Boardwalk Springs Place, Suite 210, O'Fallon, St. Charles County, Missouri.

3.      American Water Enterprises, Inc. is a Delaware corporation authorized to do business in Illinois with its Illinois registered agent at 801 Adlai Stevenson Drive, Springfield, Illinois, 62703. American Water Enterprises, Inc. is the managing entity for Environmental Management Corporation.

4.      Plaintiff , EMC, and Defendant entered into a Contract Operations Agreement on October 1, 1999, and subsequent amendments on May 1, 2002, and May 1, 2003, pertaining to operation of the wastewater facility and lift stations in the City of Pittsfield. Specifically, Defendant agreed to manage the operation and maintenance of the wastewater facility and lift stations equal to, or better than, the effluent requirements established by the U.S. Environmental Protection Agency, said contract and amendments are attached hereto, marked "Exhibit A", and made a part hereof by reference.

5.      Plaintiff terminated the contract with EMC on or about January 20, 2011, because of following numerous and severe deficiencies:

A)      Evidence of sewage residue was noted by City personnel at the manhole structure upstream for the influent to the screw pumps indicating that relatively recent overflows from this structure had occurred resulting in a direct sewage bypass to the receiving stream. The City can find no documentation where these instances were reported to the Illinois Environmental Protection Agency, hereinafter "IEPA". This untreated discharge is a direct violation of the operating permit and federal and state law.

B)      The bar screening cleaning mechanism is not functioning which results in excessive back pressure and flow buildup in the influent trough. This maintenance deficiency contributes to hydraulic overloading of the influent structure.

C)      The four lift pumps at the influent lift station are not all installed and in working order resulting in degraded pumping capacity with no backup. Without the pumps at full working capacity, the treatment plant cannot be operated to its fullest capacity. This maintenance failure has resulted in reduced process capacity, excess water holding and overflows in the collection system and two primary lift station sites (South and Northeast).

D)      Neither primary clarifier is operating; the solids depths were determined to be approximately 10' deep. No sludge judge was onsite following EMC's departure and none were reported as being used during their recent tenure. The failure of EMC to properly maintain these two clarifiers has resulted in excessive Biochemical Oxygen Demand being generated at the start of the treatment train resulting in process upsets in the downstream basins. These basins are not in compliance with Ten States Design standards. The egregious dereliction of EMC's duties is manifested in a substantial biomass growing at the tops of each clarifier, blinding of the effluent launder and weirs; and vegetation growing in the non-functioning scum troughs. Outgassing in each clarifier represents substantial sludge age seen by the significant bubble production in each basin.

E)      Sludge pumps in the secondary clarifiers were not operational; a temporary portable gas powered pump was being used to decant sludge from the secondary clarifiers which presents potential flow bypass, confined space entry and significant additional man-hours to operate this apparatus. The primary clarifiers were not being utilized. These deficiencies are non-compliant with IEPA and OSHA regulations.

F)      No documentation is accessible that assures that the flow meters and laboratory equipment have been properly calibrated. Without proper flow readings, all of the calculations related to the treatment process are suspect. Without properly certified lab equipment, none of the monthly or daily tests can be certified.

G)      Fecal coliform tests have shown multiple TNC, too numerous to count, each month with no remedy. It is believed that the tertiary filters, operational at the commencement of EMC's contract, would assist in lowering the fecal levels. The filters have been non-functional for several years while under EMC's management.

H)    Multiple air leaks are noted on the air piping headers throughout the plant. The inefficient distribution of air creates a reduced air transfer efficiency and results in higher operational costs and reduced life cycles for the blowers.

I)    General maintenance or the lack thereof is highly deficient. The lab area, upon EMC's departure, was covered in dust and cigarette smoke film; each structure has been in need of cleaning and painting; wood soffits and window sills are now rotten due to lack of paint; kick plates on safety railings have not been properly adjusted to account deflections over time thus resulting in OSHA compliance deficiencies.

6.    Plaintiff has incurred damages to correct said deficiencies in the amount of $184,006.16.

7.    Plaintiff has demanded reimbursement from Defendant for said damages but Defendant has failed to reimburse Plaintiff in the sum of $184,006.16.

8.    Said amount remains due and owing.

WHEREFORE, Plaintiff prays for judgment against Defendant in the amount of $184,006.16 plus costs of suit and for such other and further relief as this Court deems equitable and just.

CITY OF PITTSFIELD

BY: _____
        Michael J. Hollahan, Its Attorney

Michael J. Hollahan
HOLLAHAN LAW OFFICE
Attorneys at Law
109 E. Washington St.
Pittsfield, IL 62363
Phone (217) 285-5593
Fax (217) 285-5539
mike@hollahanlaw.com

## CERTIFICATION

Under penalties as provided by law pursuant to Section 1-109 of the Code of Civil Procedure, the undersigned certifies that the statements set forth in this instrument are true and correct, except as to matters therein stated to be on information and belief and as to such matters the undersigned certifies as aforesaid that he verily believes the same to be true.

DATED: ___5-30-13___

CITY OF PITTSFIELD

By _____

Its Mayor

Michael J. Hollahan
HOLLAHAN LAW OFFICE
Attorneys at Law
109 E. Washington St.
Pittsfield, IL 62363
Phone (217) 285-5593
Fax (217) 285-5539
mike@hollahanlaw.com

*melody/cities/Pittsfield/EMC.complaint.breach.contract.May7.13*

# EXHIBIT A

# Contract Operations Agreement
## With
## Pittsfield, Illinois

This AGREEMENT, made and entered into this 1ˢᵗ day of October, 1999, by and between The City of Pittsfield, 215 Monroe Street, Pittsfield, Illinois, 62363, (phone 217-285-4484), and Environmental Management Corporation, 689 Craig Road, St. Louis, MO 63141, (phone 314-432-8070).

Certified Wastewater Operator will be Jay Mull, EMC, RR#3 Box 3129A, Pittsfield, IL 62363. Phone 217-285-6208, SSN 351 50 7208.

WITNESSETH:

1. TERM. This Agreement shall be in full force and effect from October 1, 1999 through and including April 30, 2005.

2. CONTRACT OPERATOR'S RESPONSIBILITY. The Contract Operator's responsibilities pursuant to this Agreement are as follows:

   A.  Proper operation of the wastewater facility and lift stations, meeting all NPDES permit effluent requirements.

   B.  Direct the proper collection of samples, the performance of laboratory testing and submission of Discharge Monitoring Reports at a frequency to comply with the Illinois Environmental Protection Agency (IEPA) requirements.

   C.  Direct the performance of routine operational control of testing as recommended by IEPA.

   D.  Shall be responsible for providing labor, materials, and chemicals necessary for the proper maintenance and operational problems.

   E.  Shall be responsible for assuring that an adequate spare inventory is maintained and to perform preventive maintenance of equipment as recommended by the manufacturer, and to keep a preventative maintenance and spare parts record system.

   F.  Maintain required operating records and reports.

   G.  Maintain the emergency operating plan and be responsible for its implementation if necessary.

3.  OWNER'S RESPONSIBILITY.  The owner's responsibility pursuant to this agreement are as follows:  The Wastewater Collection System shall be maintained by the Owner.

4.  TERM OF AGREEMENT:  Contract Operations by EMC will be in effect as of 1, October, 1999 and will expire on 30 April, 2005, unless the agreement is extended or terminated as hereinafter provided.

City of Pittsfield                              Environmental Management Corporation

Larry Snyder, Mayor                        Jay Mull, Facility Manager

ENVIRONMENTAL

# ACORD™ CERTIFICATE OF INSURANCE

DATE (MM/DD/YY)
01/18/00

| PRODUCER | THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. |
|---|---|

PRODUCER
Welsch, Flatness, & Lutz, Inc.
701 Market, Suite 600
P.O. Box 66753
Saint Louis, MO  63166-6753

**COMPANIES AFFORDING COVERAGE**

COMPANY A St. Paul Fire & Marine

COMPANY B TIG Insurance Company (IBS)

COMPANY C American Int'l Specialty Lines

COMPANY D

INSURED
Environmental Management Corp.
689 Craig Road
Saint Louis, MO  63141

## COVERAGES

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED, NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| CO LTR | TYPE OF INSURANCE | POLICY NUMBER | POLICY EFFECTIVE DATE (MM/DD/YY) | POLICY EXPIRATION DATE (MM/DD/YY) | LIMITS | |
|---|---|---|---|---|---|---|
| A | GENERAL LIABILITY <br> X COMMERCIAL GENERAL LIABILITY <br> CLAIMS MADE X OCCUR <br> OWNER'S & CONTRACTOR'S PROT | KK08500145 <br><br> PER PROJECT AGGREGATE | 09/30/99 | 09/30/00 | GENERAL AGGREGATE | $2,000,000 |
| | | | | | PRODUCTS-COMP/OP AGG | $2,000,000 |
| | | | | | PERSONAL & ADV INJURY | $1,000,000 |
| | | | | | EACH OCCURRENCE | $1,000,000 |
| | | | | | FIRE DAMAGE (Any one fire) | $1,000,000 |
| | | | | | MED EXP (Any one person) | $ 5,000 |
| A | AUTOMOBILE LIABILITY <br> X ANY AUTO <br> ALL OWNED AUTOS <br> SCHEDULED AUTOS <br> X HIRED AUTOS <br> X NON-OWNED AUTOS | KK08500145 | 09/30/99 | 09/30/00 | COMBINED SINGLE LIMIT | $1,000,000 |
| | | | | | BODILY INJURY (Per person) | $ |
| | | | | | BODILY INJURY (Per accident) | $ |
| | | | | | PROPERTY DAMAGE | $ |
| | GARAGE LIABILITY <br> ANY AUTO | | | | AUTO ONLY-EA ACCIDENT | |
| | | | | | OTHER THAN AUTO ONLY: | |
| | | | | | EACH ACCIDENT | $ |
| | | | | | AGGREGATE | $ |
| B | EXCESS LIABILITY <br> X UMBRELLA FORM <br> OTHER THAN UMBRELLA FORM | XLB9271465 | 09/30/99 | 09/30/00 | EACH OCCURRENCE | $15,000,000 |
| | | | | | AGGREGATE | $15,000,000 |
| A | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY <br> THE PROPRIETOR/ PARTNERS/EXECUTIVE OFFICERS ARE: X INCL EXCL | WVK8500068 | 09/30/99 | 09/30/00 | X STATUTORY LIMITS | |
| | | | | | EACH ACCIDENT | $500,000 |
| | | | | | DISEASE-POLICY LIMIT | $500,000 |
| | | | | | DISEASE - EACH EMPLOYEE | $500,000 |
| A | OTHER  CONTRACTORS EQUIPMENT | IM8500857 | 09/30/99 | 09/30/00 | LEASED/RENTED EQUIP. LIMIT: $500,000 | |
| C | POLLUTION LIAB. | CP02676832 | 01/07/00 | 01/07/01 | $5,000,000 EACH LOSS <br> $5,000,000 AGGREGATE | |

DESCRIPTION OF OPERATIONS/LOCATIONS/VEHICLES/SPECIAL ITEMS

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| THE CITY OF PITTSFIELD <br> 215 NORTH MONROE ST. <br> Pittsfield, IL  62363 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, THE ISSUING COMPANY WILL ENDEAVOR TO MAIL 30 DAYS WRITTEN NOTICE TO THE CERTIFICATE HOLDER NAMED TO THE LEFT, BUT FAILURE TO MAIL SUCH NOTICE SHALL IMPOSE NO OBLIGATION OR LIABILITY OF ANY KIND UPON THE COMPANY, ITS AGENTS OR REPRESENTATIVES. <br> AUTHORIZED REPRESENTATIVE <br> *Dennis D. Flatness*  RLE |

© ACORD CORPORATION 199

# AGREEMENT FOR

## CONTRACT OPERATION AND MAINTENANCE

## OF THE

## CITY OF PITTSFIELD, ILLINOIS

## WASTEWATER TREATMENT FACILITY AND LIFT STATIONS

This AGREEMENT, made and entered into this __|__ th day of __OCT.__, 1999, by and between:

The City of Pittsfield, a municipal corporation in the County of Pike, State of Illinois with an address of 215 North Monroe Street, Pittsfield, Illinois, 62363 (hereinafter "City"), and Environmental Management Corporation (hereinafter "EMC") a Missouri corporation with its principal place of business at 689 Craig Road, St. Louis, Missouri, agree to the following:

WHEREAS: City owns a wastewater treatment facility and three sewage lift stations, (hereinafter "Facility");

WHEREAS: The City has authority under the laws of the State of Illinois to enter into a service contract for the operations and maintenance of said Facility and other associated properties and processes;

WHEREAS: EMC desires to provide the services to the City subject to the terms and conditions contained herein below;

NOW THEREFORE, in consideration of the mutual agreements herein contained, and subject to the term and conditions herein stated, parties hereto agree as follows:

I.    PURPOSE

The City agrees to engage EMC as an independent contractor to manage the operation and maintenance of the Facility (See Appendix B) during the term of this Agreement.

II.    SCOPE OF SERVICES

EMC shall provide the following services under the conditions set forth herein:

**Wastewater Treatment Facility Operation.** EMC shall manage the operation and maintenance of the Facility, in accordance with accepted industry practices and use its best efforts in accordance with such practices so that the effluent discharge is equal to, or better than, the effluent requirements established by the U.S. Environmental Protection Agency (USEPA), subject only to the terms and conditions set forth in Appendix A.

1

**Project Management and Staffing.** EMC shall staff the Facility with employees experienced and qualified in management, administrative and technical areas of wastewater treatment, process control, wastewater laboratory analysis, and maintenance procedures for Facility and equipment. The Facility operations staff provided shall have, or be working expeditiously toward the required operator licenses. At all times, the Facility shall be staffed with employees having the requisite licenses or waivers necessary to lawfully be operating such a Facility.

EMC's compensation amount as set forth in this Agreement includes assumption of the City staff for wastewater treatment in place at the commencement of this Agreement. These City employees transferring from the City payroll to the EMC payroll will continue employment with EMC throughout the life of this Agreement unless the individual voluntarily severs the employment relationship or just cause exists for the individual's employment to terminate.

**Project Support.** EMC shall provide on-call, backup expertise in operations, management, and maintenance applications to ensure compliance with this Agreement. This support shall not constitute a claim for additional compensation for EMC.

**Maintenance Management.** EMC shall institute a comprehensive preventive maintenance program for all equipment assigned to EMC by the City through this Agreement. Records maintained by EMC for the Facility shall include history of maintenance for each item of equipment, spare parts inventory, and schedule of programmed maintenance. Standard operating and maintenance procedures will be established for each major piece of operating equipment.

**Information Systems.** EMC will install computer hardware and software proven to be effective in management of scheduled and preventive maintenance, process control, and energy management. EMC staff will be trained in the use of these computer systems and processes.

**Effluent Quality.** EMC shall manage the operation and maintenance of the Facility in such manner that the effluent quality is maintained at all times at a level equal to, or better than, the effluent requirements established by the Environmental Protection Agency in the NPDES permit. EMC will guarantee effluent quality and loadings as specified in Appendix A

**Fines.** EMC shall be responsible and liable for civil penalties or fines which may imposed by USEPA, the Illinois Environmental Protection Agency (IEPA) or any regulatory agency having jurisdiction, as a result of failure to comply with the terms and conditions of any duly authorized permit, court order, administrative order, law, statute, ordinance, etc. for reasons of EMC's sole negligence during the term of this Agreement. EMC shall not be liable, however, if it can justify by appropriate documentation and evidence that any violations occurred as a result of the causes cited in Appendix A. Neither shall EMC be liable for any violations that are a direct result of prior practices, acts or omissions of others at any time.

**Corrective Action.** In the event that the effluent quality is not in compliance with regulatory requirements, EMC will submit a report to the City outlining the proposed corrective action and a schedule thereof.

**Wastewater Sludge Management and Wastewater Sludge Disposal.** EMC shall be responsible for managing the handling and disposing of wastewater treatment sludge, either with existing on site employees or by subcontracting this work, in a manner consistent with existing USEPA regulations.

**Handling and Disposal of Contaminated Sludge.** If the influent contains abnormal or biologically toxic substances the sludge for such influent shall be deemed contaminated. EMC shall make every effort to isolate such contaminated sludge consistent with current USEPA and IEPA guidelines. The City shall reimburse EMC for expenses directly related to the disposal of the contaminated sludge. The City shall reimburse EMC for expenses directly related to the disposal of the contaminated sludge.

If any sludge from the Facility is classified a hazardous waste as defined by USEPA, which means that the regulator agencies require the sludge to be transported to a designated hazardous waste landfill, EMC shall notify the City and request permission to transport the sludge to a designated landfill. The City shall reimburse EMC for the actual costs of transport, landfill fees, and any other verifiable out-of-pocket expenses associated with the handling and disposal of the sludge.

**Septic Sludge Disposal.** EMC shall allow licensed (City approved) septic tank hauling contractors to dump septic sludge into the Facility at the designated area provides all of the following are true: Such wastes are free from organic or inorganic toxic substances (either biologically toxic, or otherwise), which cannot be treated, removed, and reduced to a non-toxic state in the treatment facility; such waste do not contain any substances, the discharge of which into the receiving stream would violate any Federal, Interstate, State, or City rules, requirements, standards, or regulations; and amounts BOD and suspended solids contained in such waste do not exceed the design loading of the Facility. EMC shall monitor and analyze each septic sludge contractor, at a minimum of semi-annually, for NPDES conventional and nonconventional pollutants. Also, EMC shall submit a quarterly report to the City containing the names of the septic sludge hauling contractors and the volume dumped at the Facility. All fees applicable to septic sludge dumping shall be billed and collected by the City. Septic sludge dumping shall be allowed during normal working hours, five days per week. All septic sludge hauling contractors requesting approval for dumping sludge at the Facility shall be subject to approval by the City. EMC has the right to refuse any septic sludge materials which no not meet City criteria.

**Testing.** EMC shall sample and perform the appropriate effluent, stream and sludge testing as outlined in City's NPDES permit.

**Laboratory Analysis.** EMC shall perform the necessary testing and laboratory analyses as required by City's NPDES permit as well as for process control. EMC shall prepare all NPDES and state water permit monitoring and operation reports and submit them to IEPA with monthly copies to the City.

**Reporting.** EMC and the City shall develop reporting and communications procedures satisfactory to the City. EMC will submit monthly reports to the City and regulatory agencies in accordance with mutually established communications procedures. On an annual basis, EMC will provide formal reports to the City on projection of capital needs. EMC will be responsible for representing the City with the relevant regulatory agencies and the City will be informed of all meetings, hearings and relevant information and will be entitled to participate in any of the above.

3

**Records of Operation.** EMC shall maintain necessary and sufficient records of operation and maintenance activities to meet local, state, and federal requirements. Records maintenance will be in compliance in all material respects with all applicable law and regulations. These records, capable of providing historical data and trends, will be the property of the City. EMC will maintain these records at the Facility site, available for use by authorized personnel.

**Safety.** EMC shall administer a site-specific safety program to include training, record keeping, and safety meetings, all in conformance with any the City safety program, OSHA regulations, and any requirements of the State of Illinois.

**Training.** EMC shall implement an ongoing training program, with classroom and hands-on training for all personnel. Training will include, but not be limited to safety, Facility operations and maintenance, laboratory operations and maintenance, supervisory skills and energy management.

**EMC's Insurance Requirements.** EMC shall maintain the following insurance during the term of this Agreement:

Commercial General Liability:

| | |
|---|---|
| Bodily Injury and Property Damages | $1,000,000 Occurrence |
| | $1,000,000 Aggregate |
| Personal Injury Liability | $1,000,000 |

*The policy will contain a Waiver of Subrogation in favor of the City*
*The policy will add the City as an Additional Insured.*

Commercial Automobile Liability:

| | |
|---|---|
| Hired and Non-Owned Liability | $1,000,000 Per Accident |

Workers Compensation: — Statutory

Employers Liability:

| | |
|---|---|
| Bodily Injury By Accident | $500,000 Each Accident |
| Bodily Injury By Disease | $500,000 Policy Limit |
| Bodily Injury By Disease | $500,000 Each Employee |

Umbrella: (On top of General Liability, Automobile and Employers Liability)

| | |
|---|---|
| Bodily Injury and Property Damage | $15,000,000 Aggregate |

Professional Liability:

| | |
|---|---|
| Damages resulting from | $10,000,000 Occurrence |
| professional services | $10,000,000 Aggregate |

4

<u>Pollution Liability:</u>

Bodily Injury, Property Damage or          $5,000,000 Occurrence
Environmental Damage                        $5,000,000 Aggregate

EMC shall furnish the City with a Certificate of such insurance, and each policy shall require a 30-day notice of cancellation or material change to be given to the City while this Agreement is in effect. These policies will be in effect at the time EMC and the City execute this Agreement.

**Odor and Noise Control.** EMC will manage the Facility and programs to minimize the generation of odors and noise through an ongoing odor and noise control program and deal in a concerned, professional manner with any individuals or community groups concerned with odors or noise.

**Capital Budget Submission.** EMC shall be knowledgeable about the City's capital expenditure program for the Facility. Within the first 90 days of execution of this Agreement, and annually thereafter, EMC will submit its recommendations regarding additions to or deletions from the City's scheduled program. EMC will submit detailed rationale for any changes or additions, and preliminary cost estimates. Implementation of these recommendations by the City, however, is not a condition of EMC's performance under this Agreement. Review and approval of these capital expenditures shall remain the authority of the City.

**Inventory.** Within 90 days from the commencement of this Agreement, EMC shall submit an inventory of the equipment, tools, materials, consumables, expendable supplies, and spare parts maintained at the Facility. The City shall have 20 days to verify and accept EMC's list. At the termination of this Agreement, EMC shall pay the City in the event that the inventory of these items is less at the time of termination than this initial inventory. EMC agrees to maintain an adequate spare parts inventory for proper maintenance and repair of the Facility.

Any purchase of equipment, tools, materials, supplies, spare parts, or capital improvements shall upon the purchase thereof become the sole and absolute property of the City, subject to only the terms of this Agreement. At the termination of this Agreement, all said items shall be turned over to the City. Only purchases of items by EMC which are outside the scope of this Agreement and are not directly or indirectly reimbursed by the City, shall be titled in and remain the property of EMC.

**Emergency Response Plan.** EMC will develop, maintain, and implement, if necessary, an emergency response plan for the Facility which will be in compliance with all applicable regulations. EMC will submit its proposed plan to the City for its approval within 180 days of the initiation of this Agreement.

III.     RESPONSIBILITIES OF THE CITY

In addition to its other obligations under this Agreement, the City shall provide for EMC's use all equipment, structures, vehicles, and facilities under its ownership presently assigned to the Facility. Use of said City assets by other city departmental services is permissible as long as said use does not interfere with EMC operations. The City will be responsible for the cost of replacing any items as listed on Appendix B.

EMC will submit this list to the City for its approval within 90 days of the initiation of this agreement.

The City shall maintain all existing licenses, permits, and agreements which have been granted to the City as owner of the equipment and Facility and shall procure all others necessary to operate and maintain the Facility covered by this Agreement.

**City Insurance.** The City will maintain the following insurance during the term of this Agreement:

| | |
|---|---|
| Property Insurance (all risks): | All Facilities, Contents Equipment & Computers |
| Commercial General Liability: | |
| Bodily Injury and Property Damage | $1,000,000 Occurrence<br>$1,000,000 Aggregate |
| Personal Injury Liability | $1,000,000 |

*The policy will contain a Waiver of Subrogation in Favor of EMC.*
*The policy will add EMC as an Additional Insured.*

| | |
|---|---|
| Commercial Automobile Liability: | |
| Automobile Liability-Symbol 1<br>Comprehensive and Collision Coverage | $1,000,000 Per Accident<br>All Vehicles used by<br>EMC |

*The policy will contain a Waiver of Subrogation in Favor of EMC.*

| | |
|---|---|
| Umbrella: | |
| Bodily Injury and Property Damage | $1,000,000 Occurrence<br>$1,000,000 Aggregate |

The City shall furnish EMC with a Certificate of Insurance and each policy will contain a 30-day notice of cancellation to EMC.

IV.   COMPENSATION

**Expenses.** EMC shall pay all expenses required for the normal operation and management of the Facility including, but not limited to, personnel and benefit expenses of EMC employees, utilities (excluding water cost), analytical testing, chemicals, services, spare parts, materials, sludge disposition costs, and expendable supplies. Also, EMC shall pay all Maintenance and material items, not to exceed $56,000 for the period of October 1, 1999 through April 30, 2000 and not to exceed $96,000 annually thereafter.

Examples of items not paid for EMC include, but are not limited to, the following:

- Change in scope of services

6

- Any damages which result from an Act of God, the City, or any third party not within the control of EMC.

**Compensation.** During the first seven months, covering the period of October 1, 1999 through April 30, 2000, the City shall pay EMC, as compensation for the services to be performed as described in this Agreement, the sum of $25,957.00 per month (or $181,699, which is 7/12 of $311,484). This amount will be subject to negotiation beginning February 1, 2000 with any change resulting from said negotiation effective May 1, 2000. The amount agreed to as of May 1, 2000 will remain constant for the subsequent twelve months with future adjustments as specified hereinafter. Monthly payments are due the 10th of each month for which services will be rendered, upon presentation of invoices by EMC. Late payments shall accrue interest at the then current prime rate plus one percent per annum on the unpaid balance.

The annual compensation shall be negotiated each year three (3) months prior to the anniversary date of this Agreement beginning with the anniversary date of April 30, 2001. Should the City and EMC fail to reach an agreement, contract adjustments will be based upon the percentage change in the CPI-North Central Class D for the entire period preceding each adjustment date. Annual compensation adjustments will be cumulative.

**Example:**
The following is an example of the CPI calculation based on a start date of April 1, 1999.

1. For the months of March, 1999 and March, 2000 the CPI figures are as follows:

| CPI | March, 1999 | March, 2000 |
|-----|-------------|-------------|
|     | 100         | 105         |

2. The monthly compensation is $50,000 and is adjusted by the following calculations:

   105-100/100= .05
   $50,000 x 1.05= $52,000

   The new monthly compensation starting in April, 2000 is $52,500

3. For the months of March, 2000 and March, 2001 the CPI figures are as follows:

| CPI | March, 2000 | March, 2001 |
|-----|-------------|-------------|
|     | 105         | 110         |

4. The monthly compensation as of April, 2000 is $52,500 and is adjusted by the following calculations:

   110-105/105 = .048
   $52,500 x 1.048 = $55,020

   The new monthly compensation starting in April, 2001 is $55,020.

   **The above calculation is an example only and does not predict the actual monthly compensations for future years of this contract.**

7

**Wastewater Flows and Loadings.** The data collected from July 1998 through June 1999 establishes the benchmark flows and loadings for the Facility as follows.

Wastewater

| | |
|---|---|
| Average Annual Daily Flow: | 0.94 MGD |
| Average Daily Influent BOD: | 1621 lbs. |
| Average Daily Influent TSS: | 1621 lbs. |

If during any twelve-month period the average flow and/or loadings increase or decrease by 10% or more, the compensation paid to EMC may be adjusted upward or downward to reflect the change. The parties will negotiate this adjustment to reflect actual cost data submitted by EMC, to the extent that such data is available and can be traced to the flow and loadings changes.

**Annual Maintenance and Material Budget.** EMC shall pay all individual repair parts, maintenance materials, maintenance service items and capital improvements up to the annual budget threshold. The budget threshold for maintenance and materials has been set at $56,000 for the period of October 1, 1999 through April 30, 2000 and at $96,000 per twelve-month period thereafter.

If maintenance and material expenditures exceed the benchmarks set above, the appropriate City Representative must approve the expenditure and the cost will be paid by the City. If maintenance and material expenditures do not exceed the benchmarks set above, EMC will refund the difference to the City of Pittsfield no later than June 1 of the next contract year.

For purposes of this Agreement, Capital Improvement shall be defined as the cost of adding new equipment (accessory, appurtenances, or components thereof), or structures (as opposed to replacing, maintaining, repairing, or rebuilding the existing) which:
1) Significantly increases its efficiency and capacity for which it was designed and constructed; and
2) Has a service life of at least five (5) years; and
3) Cost in excess of $2,500 exclusive of any EMC personnel labor.

Any expenditure defined as a Capital Improvement will be reviewed with the appropriate City Representative.

V.    MISCELLANEOUS

**Term.** Services shall commence on October 1, 1999 and end on April 30, 2005, unless the Agreement is extended or terminated as hereinafter provided.

**Termination.** Either party to this Agreement may terminate this Agreement upon material breach by the other party providing such terminating party first provides written notice of such breach to the other party and assuming that such breach is not corrected within 90 days. Additionally, the City or EMC may terminate this agreement for any reason within the first 31 months (2 years, 7 months) provided 90 days notice is given. If no notice is given, the Agreement will continue for the full term.

**Extension.** The City, at its option, may extend this Agreement for an additional five-year term under the same terms and conditions as stated herein. Lack of formal notice

ninety (90) days prior to the expiration of this Agreement will result in an automatic five-year extension.

**Warranties and Guarantees.** EMC will assist the City with enforcement of existing equipment warranties and guarantees and will take responsibility for maintaining all warranties on any new equipment purchased after the Agreement is executed.

**Changes.** In the event that any changes in the scope of the operation of the Facility shall occur including, but not limited to, changes in governmental (any agency having jurisdiction) regulations or reporting requirements, effluent standards, sludge disposal restrictions, monitoring requirements, level of treatment, personnel qualifications, staffing rules, or changes in scope of services in Article II of this Agreement, which decrease the cost of operating the Facility, the City shall be entitled to an adjustment to the compensation amount payable to EMC which shall be retroactive to the date of the change and negotiated by the parties within 90 days. Alternatively, any changes in the scope of services which increase the cost of operating the Facility shall entitle EMC to a reasonable amount of a negotiated increase in the compensation amount also retroactive to the date of change.

**Hold Harmless.** EMC agrees to and shall hold the City, its elected and appointed officers, and its employees harmless from any liabilities for claims or damages, or fines including attorney fees, for personal injury or property damage which is caused by, or arises from the negligence of EMC unless such claims or damages or fines are caused or contributed to by (i) the wastewater influent to meet the criteria set forth on the attachment hereto, (ii) by the presence of any hazardous, toxic, or radioactive substances within the Facility. The obligation of EMC to hold harmless the City is subject to the Limitation of Liability provision of this Agreement.

**Limitation of Liability.** In no event and under no circumstances shall either party be liable to the other party for consequential, incidental, indirect, special or punitive damages, due to tort or negligence, in excess of insurance limits herein established.

**Comparative Responsibility.** In the event that both EMC and the City are found by an independent fact finder to be negligent, and the negligence of both is the proximate cause of such claim for damage for personal injury or property damage, then in such an event each party shall be responsible for the portion of the liability equal to such party's comparative share of the total negligence.

**Waiver.** The failure on the part of either party to enforce its right as to any provision of this Agreement shall not be construed as a waiver of its rights to enforce such provisions in the future.

**Assignments.** This Agreement shall not be assigned by either party without the prior written consent of the other party unless such assignment shall be an affiliate or successor of either party.

**Nondiscrimination.** EMC agrees and shall refrain from unlawful discrimination in employment and undertakes affirmative action to ensure a quality of employment opportunity; shall comply with procedures and requirements of the State Human Rights Department's regulations concerning equal employment opportunity and Affirmative action; and shall provide such information, with respect to its employees and applicants for employment and assistance as the department may reasonably request.

**Relationship.** It is understood that the relationship of EMC to the City is that of an independent contractor and that none of the employees or agents of EMC shall be considered employees of the City.

**Force Majeure.** Each party's performance under this Agreement shall be excused if the party is unable to perform because of actions due to causes beyond its reasonable control, including but not limited to Acts of God, the acts of civil or military authority, floods, epidemics, quarantine restrictions, riots, strikes, and commercial impossibility, interruption of electrical power or other utility service, the inability of microprocessors and computer software to correctly process dates involving the year 2000, the failure or inability of microprocessors and computer software to properly exchange data with outside sources, any year 2000 failure, or the inability of a supplier to provide goods or services to either or both of the parties hereto because of a year 2000 failure. For purposes of this paragraph, the term "year 2000 failure" means any failure by any device or system (including without limitation, any computer system and any microchip or integrated circuit embedded in another product or device) or any software, firmware, or other set or collection of processing instructions, however constructed, in processing, calculating, sequencing, displaying, storing, transmitting, or receiving date-related data, including without limitation, failure in accurately dealing with or failure inaccurately accounting for transitions or comparisons from, into, and between the year 1999 and 2000, failure to recognize or accurately process any specific date, and failure accurately to account for the year 2000's status as a leap year. In the event of any such force majeure, the party unable to perform shall notify the other party within 24 hours of the existence of such force majeure and shall be required to resume performance of its obligations under this Agreement upon the termination of the aforementioned force majeure.

**Authority to Contract.** Each party warrants and represents that it has authority to enter into this Agreement. The City warrants, represents and certifies that it has appropriate funds available for payments to EMC required by this Agreement. In the event the City is unable to provide appropriate funds, EMC shall have the option of terminating this Agreement without needing to wait for the 90-day curement period of breach of contract.

**Access.** EMC agrees to allow authorized City officials access to the Facility covered by this Agreement at any time.

**Notices.** All notices shall be in writing and shall be delivered in person or transmitted by certified or registered mail, return receipt requested. Notices required to be given to EMC shall be addressed to:

    Environmental Management Corporation
    689 Craig Road
    St. Louis, MO  63141

Notices required to be given to the City shall be addressed to:

    City of Pittsfield
    215 N. Monroe St.
    Pittsfield, IL  62363-1928

IN WITNESS WHEREOF, the City of Pittsfield and Environmental Management Corporation sign this Agreement as of the date first above written.

ATTEST:                                              CITY OF PITTSFIELD

_Tim Belford_                                        Mayor Larry Snyder

ATTEST:                                              ENVIRONMENTAL MANAGEMENT
                                                     CORPORATION

_Cynthia C. Rider_                                   Craig Mundt

11

## APPENDIX A:  EFFLUENT QUALITY GUARANTEE

EMC will manage the operation and maintenance of the Wastewater Treatment Facility so that the effluent discharged will meet the requirements of the NPDES permit number IL003066 expiration date of April 30, 2002.

EMC will be responsible for meeting the effluent quality requirements of the NPDES permits unless one or more of the following occurs:

1. The influent to the Treatment Facility does not contain adequate nutrients to support operation of biological processes and/or contains biologically toxic substances which can not be removed by existing process and facilities (see Definitions below).

2. Discharges into the City's sewer system violate any of the regulations stated in the City's Sewer Use Ordinance.

3. EMC evaluated the process and found it is operating beyond design criteria.  The influent TSS is greater than the plant design parameter.  EMC will guarantee effluent quality unless the flow, influent $cBOD_5$, and/or influent is greater than the following:

   | | |
   |---|---|
   | Average Flow | 1.5 MGD—design average flow |
   | Peak Flow | 3.45MGD—design maximum flow |
   | Influent $BOD_5$ | 2,526 lbs/day—design=1,686 lbs/day |
   | Influent TSS | 2,195 lbs/day—design=1,433 lbs/day |

4. If the Treatment Facility can operate only at a reduced capacity due to construction activities, fire, flood, adverse weather conditions, labor disputes or other causes beyond EMC's control.

5. In the event that influent and effluent metals concentration become excessive, then the City agrees to reduce the levels of contributions to a level which allows the treatment plant to resume compliance with their respective NPDES permits.

Definitions.

Adequate Nutrients: Treatment Facility influent nitrogen, phosphorus and iron in percentages as they relate to $BOD_5$ as follows:  Nitrogen-5%; Phosphorus-1%; Iron-.5%

Biologically Toxic: Any substance or combination of substances contained in the influent to the Treatment Facility in sufficiently high concentrations so as to interfere with the treatment process necessary for the removal or organic and chemical constituents of the wastewater required to meet the discharge requirements of the NPDES permit.

# APPENDIX B: FACILITY DESCRIPTION
# AND MAJOR OPERATING EQUIPMENT



ENVIRONMENTAL
MANAGEMENT
CORPORATION

PITTSFIELD FACILITY
RR3, BOX 3129A
PITTSFIELD, ILLINOIS 62363
PHONE/FAX 217-285-6208

# AMENDMENT TO AGREEMENT
## FOR CONTRACT OPERATIONS AND MAINTENANCE
## OF THE CITY OF PITTSFIELD, ILLIOIS
## WASTEWATER TREATMENT FACILITY AND LIFT STATIONS

This Amendment to Agreement for Contract Operations and Maintenance of the City of Pittsfield, Illinois Wastewater Treatment Facility and Lift Stations (Amendment #1) is made effective May 1, 2002, between the City of Pittsfield, a municipal corporation in the County of Pike, State of Illinois (hereinafter "City") and Environmental Management Corporation (hereinafter "EMC"), the parties agree to the following:

**Whereas,** on October 1, 1999, the City and EMC entered into an Agreement for Contract Operations and Maintenance of the City of Pittsfield, Illinois Wastewater Treatment Facility and Lift Stations (hereinafter "Agreement");

**Whereas,** effective May 1, 2002 the City and EMC now desire to amend the Agreement as to the issue of maintenance and repair and termination.

**Now therefore,** in consideration of the mutual agreements herein contained, the parties hereto agree as follows:

1. The first paragraph in the section entitled "Compensation" as written on page 7 of the Agreement in Article IV—Compensation shall be stricken in its entirety and replaced with the following:

   **Compensation.** During the twelve month period covering May 1, 2002 through April 30, 2003, the City shall pay EMC, as compensation for the services to be performed as described in this Agreement, the sum of $21,602.31 per month ($259,227.72 annually). Monthly payments are due the 10th of each month for which services will be rendered, upon presentation of invoices by EMC.

2. The section entitled "Annual Maintenance and Material Budget" as written on page 8 of the Agreement in Article IV—Compensation shall be stricken in its entirety and replaced with the following:

**Annual Maintenance and Material Budget.**  EMC shall pay all individual repair parts, maintenance materials, maintenance service items and capital improvements up to the budget threshold.  The budget threshold for maintenance and materials for the period of May 1, 2001 through April 30, 2002 was $96,000.

For the period of May 1, 2001 through April 30, 2002 EMC shall prepare and submit a detailed maintenance and repair report.  In the event the amount spent by EMC during this period is less than $96,000, EMC will refund this difference to the City no later than May 15, 2002.

Beginning May 1, 2002, EMC shall pay all individual repair parts, maintenance materials, and maintenance service items under $2,000 per event, excluding EMC labor, during the term of this Agreement.  Any maintenance or repair item which costs in excess of $2,000 excluding EMC labor shall be approved by the appropriate City representative and paid for directly by the City.

The budget for individual maintenance and repair items costing less than $2,000 for the period of May 1, 2002 through April 30, 2005 is established at $2,500 per month ($30,000 annually as opposed to $96,000 annually).  Any amount less than the established threshold not expended by EMC for maintenance during a given contract shall be returned to the City in full within 60 days of the end of the contract year.  During any contact year, amounts expended by EMC which aggregate to a total greater than the benchmark for maintenance and repair items, are to be reimbursed by the City to EMC within 60 days of the end of the contract year.

For purposes of this Agreement, Capital Improvement shall be defined as the cost of adding new equipment (accessory, appurtenances, or components thereof), or structures (as opposed to replacing, maintaining, repairing, or rebuilding the existing) which:
1. Significantly increases its efficiency and capacity for which it was designed and constructed;
2. Has a service life of at least five (5) years; and
3. Cost in excess of $2,000 exclusive of any EMC personnel labor.

Any expenditure defined as a Capital Improvement will be reviewed with the appropriate City Representative.

3. The final sentence in the section entitled "Termination" as written on page 8 of the Agreement in Article V, Miscellaneous shall be stricken in its entirety and replaced with the following:

Furthermore, the City or EMC may terminate this Agreement for any reason each April 30 anniversary date throughout the term of this Agreement provided 90 days written notice is given.

IN WITNESS WHEREOF, the City of Pittsfield and Environmental Management Corporation sign this Amendment #1 as of the date first above written.

ATTEST:                                    CITY OF PITTSFIELD


*Cindy M. Kvorka*                          *Mayor Larry Snyder*


ATTEST:                                    ENVIRONMENTAL MANAGEMENT
                                           CORPORATION

# AMENDMENT NO. 2 TO
## AGREEMENT FOR CONTRACT OPERATION AND MAINTENANCE OF THE CITY OF PITTSFIELD, ILLINOIS, WASTEWATER TREATMENT FACILITY AND LIFT STATIONS

This amendment to Agreement for Contract Operation and Maintenance of the City of Pittsfield, Illinois, Wastewater Treatment Facility and Lift Stations ("Amendment No. 2") is made effective as of May 1, 2003, between the City of Pittsfield, a municipal corporation in the County of Pike, State of Illinois (hereinafter "City"); and Environmental Management Corporation, a Missouri corporation with its principal place of business at 1001 Boardwalk Springs Place, Suite 210, O'Fallon, Missouri 63366 (hereinafter "EMC"). The City and EMC are sometimes herein referred to individually as a "Party" and collectively as the "Parties."

### WITNESSETH:

WHEREAS, the City and EMC are parties to that certain Agreement for Contract Operation and Maintenance of the City of Pittsfield, Illinois, Wastewater Treatment Facility and Lift Stations, effective as of October 1, 1999, and as amended on May 1, 2002. (Hereinafter, the Agreement, as previously amended, shall be referred to as the "Agreement.")

WHEREAS, the City and EMC desire to modify the Agreement upon the terms and conditions as set forth in this Amendment No. 2.

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained, the Parties hereby agree as follows:

1. Article IV of the Agreement is hereby further amended to provide as follows:

   a. Section "Compensation" is hereby amended by changing the "sum of $21,602.31 per month ($259,227.72 annually)" to the "sum of $22,986.48 per month ($275,837.76 annually)."

   b. A new paragraph is hereby added to Section "Compensation" to read as follows:

   "The Parties recognize that a proposed fourth sewage lift station, servicing the Industrial Park, may soon be added to the EMC scope of services. At the time the City chooses to add this sewage lift station to EMC's scope of services, the Parties agree that the compensation to be paid to EMC annually for this change in the scope of services, and in addition to all other remuneration paid to EMC under the Agreement shall be increased by $2,500.00, plus $500.00 for each existing parcel of property contributing wastewater flow through this sewage lift station. In addition, the Parties further agree that an amount of $500.00, on an annual basis, shall be added to the compensation of EMC for each new parcel of property contributing wastewater flow through this sewage lift station. This process of parcels of properties contributing to wastewater to the proposed sewage lift station shall continue until a total of $12,000.00 is included in the annual total compensation paid to EMC which is in connection with the proposed sewage lift station."

   c. A new Section "Electricity, Natural Gas and Water Threshold" shall be added to Article IV to read as follows:

"Electricity, Natural Gas and Water Threshold. The City and EMC agree that the combined threshold for each contract year for total electricity, natural gas and water expenditures shall be $60,000.00. This threshold, as well as all of the compensation payable to EMC, shall be adjusted in the event that the electric, natural gas, and/or water rates change from those as of May 1, 2003, retroactive to the date of the change. EMC will directly pay these expenses to the utility suppliers and will submit copies of said invoices upon request to the City. Any amount less than the then-current threshold expended by EMC for electricity, natural gas and/or water during a given contract year shall be reimbursed to the City in full within 60 days of the end of said contract year. Any amount more than the then-current threshold expended by EMC for electricity, natural gas and/or water during a given contract year shall be reimbursed to EMC by the City in full within 60 days of the end of said contract year."

2. The date of "April 30, 2005," in Section "Term" of Article V of the Agreement shall be changed to "April 30, 2015."

3. Section "Extension" of Article V of the Agreement shall be deleted in its entirety and not replaced.

4. Capitalized terms not defined in this Amendment No. 2 shall have the meaning assigned to them in the Agreement.

5. Except as otherwise expressly modified herein, all of the terms and conditions of the Agreement shall remain in full force and effect.

6. This Amendment No. 2 may be executed in two or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

IN WITNESS WHEREOF, the City and EMC sign this Amendment No. 2 as of the effective date first above written.

CITY OF PITTSFIELD

ATTEST:

_Cindy M. Kvorka_

_Mayor Larry Snyder_

ENVIRONMENTAL MANAGEMENT
CORPORATION

ATTEST: